**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| AUXILIOR CAPITAL PARTNERS, INC., <br><br>     Plaintiff, <br><br> v. <br><br> AHA HUTS, LLC and THE PENITIGRI GROUP LLC, <br><br>     Defendants. | Civil Action File <br> No. 2:25-CV-01066 T (1) |

**DEFENDANTS' ANSWER AND COUNTERCLAIMS**

Defendants AHA Huts, LLC and The Penitigri Group, LLC (hereinafter collectively "Defendants") respond to the Complaint filed by Plaintiff Auxilior Capital Partners, Inc. ("Auxilior" or "Plaintiff"), and for their Answer and Affirmative Defenses state as follows:

**AFFIRMATIVE DEFENSES**

**FIRST DEFENSE**

Plaintiff's Complaint fails to state a claim upon which relief can be granted, including because it does not plead facts sufficient to establish a valid default, proper acceleration, or entitlement to the equitable relief sought.

## SECOND DEFENSE

Plaintiff has failed to join necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure, including Pizza Hut LLC, the franchisor, and Horizon River Restaurants, LLC, the proposed buyer, whose rights, conduct, and interests are directly implicated by the allegations and relief sought.

## THIRD DEFENSE

Plaintiff breached the implied covenant of good faith and fair dealing by engaging in conduct that undermined the forbearance process and deprived Defendants of the benefit of their negotiated workout and sale arrangements.

## FOURTH DEFENSE

Plaintiff materially breached the forbearance agreements by, among other things, interfering with sale efforts, declaring improper or premature defaults, and failing to perform its obligations thereunder, thereby excusing Defendants' performance.

## FIFTH DEFENSE

The essential purpose of the forbearance agreements—facilitating an asset sale to repay the debt—was frustrated by Plaintiff's conduct, rendering enforcement inequitable and improper.

## SIXTH DEFENSE

Plaintiff is barred from recovery because it tortiously interfered with Defendants' prospective business relationships, including relationships with the proposed buyer, franchisor, landlords, vendors, and other third parties, thereby impairing the sale and repayment process.

## SEVENTH DEFENSE

Plaintiff is equitably estopped from asserting default, acceleration, or enforcement rights based on its representations, conduct, and inducements upon which Defendants reasonably relied to their detriment.

## EIGHTH DEFENSE

Plaintiff's claims for equitable relief, including appointment of a receiver or keeper, are barred by the doctrine of unclean hands due to Plaintiff's inequitable conduct in connection with the forbearance and sale process.

## NINTH DEFENSE

Plaintiff failed to mitigate its alleged damages by refusing to cooperate with or by actively undermining transactions that would have satisfied the alleged indebtedness.

3

**TENTH DEFENSE**

Defendants reserve the right to assert additional affirmative defenses as discovery proceeds.

**ANSWERS**

1.  Plaintiff, Auxilior, is a Delaware corporation, whose principal place of business is located in Plymouth Meeting, Pennsylvania. As such, Auxilior is a citizen of the State of Delaware and the Commonwealth of Pennsylvania.

ANSWER.  Defendants are without sufficient information to admit or deny this allegation.

2.  Defendant, Lisa Albert, is an individual of the full age of majority and a citizen of the State of Georgia.

ANSWER.  Admitted.

3.  Defendant, The Penitigri Group LLC ("Penitigri Group"), is a limited liability company comprised of one member, Lisa Albert, who is a citizen of the State of Georgia. Therefore, Penitigri Group is a citizen of the State of Georgia.

ANSWER.  Admitted.

4

4. Defendant, AHA Huts, LLC ("AHA" or "Borrower"), is a limited liability company comprised of two members: defendants, Lisa Albert and Penitigri Group. As noted in the preceding paragraphs, both Lisa Albert and Penitigri Group are citizens of the State of Georgia. Therefore, AHA is a citizen of the State of Georgia.

ANSWER.  Admitted.

5. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and complete diversity exists between the Plaintiff—a citizen of the State of Delaware and the Commonwealth of Pennsylvania—and the Defendants—each of whom is a citizen of the State of Georgia.

ANSWER.  Admitted.

6. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(a) because this is the district in which a substantial part of the property that is the subject of the action is situated.

ANSWER.  Admitted.

7. Auxilior is the holder for value of that certain Loan and Security Agreement, No. 1002571, dated August 31, 2022 (the "Loan Agreement") by and between

Auxilior, as lender, and AHA, as borrower, and certain other loan documents from time to time executed and delivered to Auxilior in connection with the Loan (collectively, the "Loan Documents"), pursuant to which Auxilior agreed to make, and AHA agreed to accept, the loan as more particularly described and subject to the terms and conditions set forth therein (the "Loan").

ANSWER.  Defendants respond that the Loan documents speak for themselves.

8. Auxilior is the owner and holder of that certain Promissory Note for Agreement No. 1002571-001 dated August 31, 2022 (the "001 Note") in the original principal amount of $5,650,000.00 executed by AHA in favor of, and payable to the order of, Auxilior, evidencing the Loan with interest thereon and payable as provided in the Note and in the Loan Agreement.

ANSWER.  Defendants respond that the Loan documents speak for themselves.

9. The 001 Note has a stated interest rate of 7.15% per annum, calculated on the basis of a 360-day year and a 30-day month.

ANSWER.  Defendants respond that the Loan documents speak for themselves.

10. The 001 Note provides that upon the occurrence of an event of default, interest shall accrue at default rate that consists of the stated interest rate plus an additional 5% (for a total interest rate of 12.15% after an event of default on the 001 Note).

ANSWER.  Defendants respond that the Loan documents speak for themselves.

11. The 001 Note is payable on the following terms:

(a) one payment of accrued and unpaid interest on the principal advances, to be paid on October 15, 2022;

(b) commencing on October 15, 2022, and on the first day of each month thereafter, for a period of 59 months, payments of $66,235.66 each; and

(c) unless sooner paid, a final lump sum payment in the estimated amount of $3,399,342.46, to be paid on the maturity date of September 15, 2027.

ANSWER.  Defendants respond that the Loan documents speak for themselves.

12. Auxilior is the owner and holder of that certain Promissory Note for Agreement No. 1002571-002 dated October 31, 2022 (the "002 Note") in the original principal amount of $63,800.00 executed by AHA in favor of, and payable to the order of, Auxilior, evidencing the Loan with interest thereon and payable as provided in the Note and in the Loan Agreement.

7

ANSWER.  Defendants respond that the Loan documents speak for themselves.

13. The 002 Note has a stated interest rate of 8.10% per annum, calculated on the basis of a 360-day year and a 30-day month.

ANSWER.  Defendants respond that the Loan documents speak for themselves.

14. The 002 Note provides that upon the occurrence of an event of default, interest shall accrue at default rate that consists of the stated interest rate plus an additional 5% (for a total interest rate of 13.10% after an event of default on the 001 Note).

ANSWER.  Defendants respond that the Loan documents speak for themselves.

15. The 002 Note is payable on the following terms:

(a) commencing on December 15, 2022, and on the fifteenth day of each month thereafter, for a period of 57 months, payments of $78,007.00 each; and

(b) unless sooner paid, a final lump sum payment in the estimated amount of $40,192.67, to be paid on the maturity date of September 15, 2027.

ANSWER.  Defendants respond that the Loan documents speak for themselves.

16. The Loan, including, without limitation, the obligations of AHA to Auxilior evidenced by the 001 Note and the 002 Note, and the Secured Obligations, as defined below, are secured by, among other things, the Loan Agreement.

ANSWER.  Defendants respond that the Loan documents speak for themselves.

17. AHA executed the Loan Agreement through its duly authorized Member and President, Lisa Albert.

ANSWER.  Defendants admit that Lisa Albert is a duly authorized Member and President.   Defendants further respond that the Loan documents speak for themselves.

18. Section 1(A)(7) of the Loan Agreement defined the "Collateral" as follows:

**"Collateral"** shall mean all existing and after-acquired property of Borrower of any nature, located at or used in connection with the restaurant operations at the existing as well as any newly-developed and/or acquired Sites, including, without limitation:

(i) All present and future Accounts, contract rights, Chattel Paper, Instruments and Documents, and all other rights to the payment of money, whether or not yet earned, for services rendered or Goods sold or furnished by Borrower or otherwise, together with: (a) all Goods, the sale or other furnishing of which shall be given or may give rise to any of the foregoing; (b) all of Borrower's rights as a consignor, consignee, unpaid vendor, or other lien or in connection therewith, including stoppage in transit, set-off: detinue, replevin and reclamation; (c) all General Intangibles related thereto; (d) all guaranties, mortgages, security interests, assignments, and other encumbrances on real or personal property, leases, and other agreements or property securing or relating to any Accounts; (e)

choses in-action, claims and judgments; (f) any returned or unearned premiums, which may be due upon cancellation of any insurance policies; (g) all present and future machinery, equipment, furniture, trade fixtures, appliances, motor vehicles, tools, jigs, molds and other articles of tangible personal property of every type, together with all parts, supplies, substitutions, accretions, accessions, attachments, devices, accessories, components and replacements thereof, and all manuals of operation, maintenance or repair, and all software related thereto (collectively, the "**Equipment**");

(h) all present and future Inventory of Borrower and Borrower's cash and accounts receivables; (t) all present and future General Intangibles, licenses, permits, approvals, software and computer programs, license rights, royalties, trade secrets, methods, processes, know-how, formulas, drawings, specifications, descriptions, label designs, plans, and blueprints; (i) all of Borrower's Commercial Tort Claims; (k) all present. and future files, books and records, invoices, bills, certificates or documents of ownership, bills of sale, business papers, correspondence, and all copies and reproductions of all the foregoing, relating to the collateral described in the preceding paragraphs; and  (l) all products and Proceeds (including, without limitation, insurance proceeds) of the foregoing and all supporting obligations related thereto. Notwithstanding the foregoing, the security interest in Borrower's rights in and to the Pizza Hut Franchise Agreements for the Sites shall be limited to the proceeds or other consideration from the sale, transfer, or other disposition of any such Franchise Agreement, or Borrower's rights therein, subject to the rights of Franchise, to the extent a security interest may be granted pursuant to the terms of the Pizza Hut Franchise Agreements.

ANSWER.  Defendants respond that the Loan documents speak for themselves.

19. Section 1(A)(36) of the Loan Agreement defines the "Sites" to mean "the Pizza Hut restaurants which are owned and/or operated by the Borrower, as listed on Schedule 1 hereto."

ANSWER.  Defendants respond that the Loan documents speak for themselves.

20. Schedule 1 of the Loan Agreement identifies the Sites listed therein, all of which are physically situated in Louisiana.

SCHEDULE 1: Site List

| Store Number | Address | City | State | Zip | Concept | Sub Concept |
|---|---|---|---|---|---|---|
| 34320 | 1665 Highway 3125 | Gramercy | LA | 71052 | PWST | DELCO |
| 34321 | 150 Belle Terre Blvd | La Place | LA | 70068 | PWST | DELCO |
| 34322 | 317 W Esplanade Ave | Kenner | LA | 70065 | PWST | DELCO |
| 34123 | 12439 Hwy US 90 | Luling | LA | 70070 | PWST | DELCO |
| 34324 | 6302 West Park Blvd | Houma | LA | 70364 | PWST | DELCO |
| 34325 | 1001 Highway 1 South | Donaldsonville | LA | 70346 | PWSI | DFICO |
| 34326 | 4882 Highway 1 | Mathews | LA | 70375 | PWST | DELCO |
| 34327 | 1970 Ormond Blvd. | Destrehan | LA | 70047 | PWST | DELCO |
| 34328 | 16258 W Main Street | Cut Off | LA | 70345 | PWST | DELCO |
| 34329 | 124 Rienzi Drive | Thibodaux | LA | 70301 | PWST | DELCO |
| 34330 | 1232 St Charles St | Houma | LA | 70360 | PWST | DELCO |
| 34331 | 4783 Highway 308 | Napoleonville | LA | 70390 | PWST | DELCO |
| 34332 | 6011 Hwy 182 | Morgan City | LA | 70380 | PWST | DELCO |
| 34335 | 1949 Prospect Blvd | Houma | LA | 70363 | PWST | DELCO |
| 34336 | 612 Catherine St | Patterson | LA | 70392 | PWST | DELCO |

ANSWER. Defendants admit that the Sites are physically situated in Louisiana. Defendants further respond that the Loan documents speak for themselves.

21. Section 1(A)(29) of the Loan Agreement defines the "Obligations" as follows:

11

29. "**Obligations**" shall mean (i) all indebtedness evidenced by and according to the terms of the Notes, this Agreement, and the other Loan Documents, including, without limitation, all interest, fees, costs and expenses accrued or incurred after the filing of any petition under any bankruptcy or insolvency law (regardless of whether allowed or allowable in whole or in part as a claim therein); (ii) all sums hereafter loaned, paid out, expended, or advanced by Lender under the terms of this Agreement or otherwise arising under the Loan Documents, to or for the account of Borrower, together with interest thereon; (iii) all extensions or renewals of the Notes, this Agreement, and the other Loan Documents evidencing sums hereafter loaned, paid out, expended or advanced by Lender, its successors or assigns, to or for the account of Borrower; and (iv) the discharge and performance of all agreements and obligations under the Notes, this Agreement, and the other Loan Documents.

ANSWER. Defendants respond that the Loan documents speak for themselves.

22. In Section 5(A) of the Loan Agreement AHA collaterally pledged, assigned, transferred, conveyed, mortgaged, delivered, and granted to Auxilior a first priority security interest in the Collateral as security for the full and timely payment and performance of all obligations, indebtedness, and liabilities of AHA to Auxilior, including without limitation the Obligations, whether now existing or hereafter incurred, matured or unmatured, direct or indirect, primary or secondary, related or unrelated or due or to become due, arising under the Loan Documents or any other documents, instruments, or agreements among AHA and Auxilior, and any extensions, modifications, substitutions, increases and renewals thereof, and substitutions therefor.

ANSWER. Defendants respond that the Loan documents speak for themselves

12

23. In Section 5(A) of the Loan Agreement AHA also agreed that the Loan Agreement shall 'constitute a Security Agreement within the meaning of the UCC, and AHA being the Debtor and Auxilior being the Secured Party.

ANSWER.  Defendants respond that the Loan documents speak for themselves

24. Auxilior's security interests granted in the Loan Agreement on the personal and movable property, including, without limitation, the Collateral set forth in the Loan Agreement, was perfected by the filing of that certain UCC-1 Financing Statement on August 31, 2022, with the Pennsylvania Department of State as UCC Filing No. 2022083101776.

ANSWER.  Defendants respond that the Loan documents speak for themselves

25. Section 10(A)(l) of the Loan Agreement states, in pertinent part, that the failure of AHA to pay any amount of principal or interest on any note, or any fee or other sums payable hereunder, or any other Obligations, on or before the 5th day after such payment is due shall constitute an "Event of Default" of the Loan Agreement.

ANSWER.  Defendants respond that the Loan documents speak for themselves

26.  Further, Section 10(B) of the Loan Agreement provides, in pertinent part, as follows:

13

B.   **Remedies.** At the option of Lender, upon the occurrence and during the continuance of an Event of Default:

1.   The entire unpaid principal of the Loan, all other Obligations, or any part thereof, all interest accrued thereon all fees due hereunder and all other obligations of Borrower to Lender hereunder or under any other Loan Documents will become immediately due and payable without any further demand or notice; provided, however, that if the Event of Default is due to a Bankruptcy proceeding filed by or against Borrower or any Guarantor, the principal balance of the Loan, and all unpaid interest accrued thereon and any other amounts due hereunder shall automatically become due and payable in full without presentment, demand or notice of any kind, all of which are hereby waived by Borrower, and/or

2.   Lender may increase the interest rate on the Loan to the applicable Default Rate set forth in the Notes, without notice; and/or

3.   Lender may enter any premises occupied by Borrower or appoint a receiver: in compliance with applicable laws, and take possession of the Collateral and any records relating thereto as permitted under applicable laws; and/or

4.   Lender may exercise each and every right and remedy granted to it under the Loan Documents, under the Uniform Commercial Code and under any other applicable law or at equity.

ANSWER.   Defendants respond that the Loan documents speak for themselves.

27. In sum, under Section I0(B) of the Loan Agreement, if an Event of Default has occurred and is continuing, Auxilior may declare the entire unpaid principal balance of the loan as due, increase the interest rate to the Default Rate as defined in the 001 Note and the 002 Note, appoint a receiver (a/k/a Keeper under Louisiana law) take and maintain full control of the Collateral and any records relating thereto, and exercise each and every right granted to it under the Loan Documents and any applicable law.

ANSWER.   Defendants respond that the Loan documents speak for themselves.

28. Furthermore, La. Rev. Stat. ann. 9:5136, *et seq.,* expressly permits the appointment of a keeper.

ANSWER.   Defendants respond that the statute speaks for itself.

14

29. To guaranty the obligations of AHA to Auxilior in connection with the Loan, Lisa Albert executed that certain Personal Guaranty dated August 31, 2022, in favor of Auxilior (the "Albert Guaranty"), pursuant to which Lisa Albert is obligated irrevocably, absolutely, and unconditionally, solidarity, jointly and severally, for the full and prompt payment of all amounts payable under the Loan Documents.

ANSWER. Defendants respond that the Loan documents speak for themselves.

30. To guaranty the obligations of AHA to Auxilior in connection with the Loan, Penitigri Group executed that certain Corporate Guaranty dated August 31, 2022, in favor of Auxilior (the "Penitigri  Guaranty"), pursuant to which Penitigri Group is obligated irrevocably, absolutely, and unconditionally, solidarity,  jointly and severally, for the full and prompt payment of all amounts payable under the Loan Documents.

ANSWER. Defendants respond that the Loan documents speak for themselves.

31. AHA, and in turn, Lisa Albert and Penitigri Group, as guarantors, are in default under the terms and conditions of the Loan Agreement, Note, and the Albert Guaranty and Penitigri Guaranty because AHA has failed to, among other things, pay all required monthly payments due under the 001 Note.

ANSWER. Defendants respond that the Loan documents speak for themselves.

32.  As a result of the aforementioned defaults, by letters dated September 5, 2024, and September 16, 2024, Auxilior placed AHA in default, and confirmed the assessment of default interest on the 001 Note and the 002 Note.

ANSWER. Defendants respond that the Loan documents speak for themselves and Plaintiff sent letters dated September 5, 2024 and September 16, 2024.

33.  Lisa Albert and Penitigri Group were copied on those letters.

ANSWER.  Admitted.

34.  Additionally, by letter dated May 2, 2025, Auxilior confirmed that AHA was in default of the 001 Note and the 002 Note, and that Auxilior may pursue any right under the Loan Documents without further notice.

ANSWER.  Defendants respond that those documents speak for themselves.

35. Lisa Albert and Penitigri Group were also copied with that letter.

ANSWER.  Admitted.

36.  Despite these notices of default, AHA, and Lisa Albert and Penitigri Group, as guarantors, have failed to pay all amounts due under the 001 Note and the 002 Note, and, in turn, the Loan Agreement, the Albert Guaranty, and the Penitigri Guaranty.

ANSWER.  Denied as stated.

37.  Consequently, AHA is in default under the Loan Agreement, the 001 Note and the 002 Note, and, in turn, Lisa Albert is in default under the Albert Guaranty, and Penitigri Group is in default under the Penitigri Guaranty.

ANSWER.  Defendants respond that those documents speak for themselves.

38. In Section 10(F)(2) of the Loan Agreement, AHA agreed to pay Auxilior's losses, costs, and expenses in connection with the enforcement, protection, and preservation of Auxilior's rights or remedies under the Loan Documents, "including, without limitation court costs, reasonable attorney's fees, including without limitation reasonable attorney's fees incurred post judgment, and reasonable expenses of accountants and appraisers."

ANSWER.  Defendants respond that the Loan documents speak for themselves.

39.  Auxilior has engaged counsel to (a) enforce Auxilior's rights under the Loan Agreement, the 001 Note, the 002 Note, the Albert Guaranty, and the Penitigri Guaranty, and (b) institute these proceedings to collect the amounts due thereunder, and seek recognition of and enforce, the Loan Agreement, including the security interests thereunder.

ANSWER.  Defendants have no personal knowledge of how and why Auxilior has engaged counsel.

40. Accordingly, Auxilior is entitled to recover from AHA, Lisa Albert, and Penitigri Group, the reasonable attorneys' fees, court costs and other expenses that it incurs in connection with its collection efforts, including the filing and prosecution of these proceedings.

ANSWER. This allegation is a legal conclusion to which a response is not required.

41. The amount due from, and unpaid by, AHA, and, in turn, Lisa Albert and Penitigri Group, as Guarantors, to Auxilior under the 001 Note, the 002 Note, the Albert Guaranty, and the Penitigri Guaranty, totals $5,891,669.78 as of May 20, 2025, calculated as follows (not including attorney's fees): [amount table omitted in original pleading body]

ANSWER. Denied as stated.

42. Interest is continuing to accrue on the 001 Note at the default rate specified in the 001 Note from May 21, 2025, until all of the obligations of AHA, and Lisa Albert and Penitigri Group, as Guarantors, to Auxilior under the 001 Note are paid in full.

ANSWER. This allegation is a legal conclusion to which a response is not required.

18

43. Interest is continuing to accrue on the 002 Note at the default rate specified in the 002 Note from May 21, 2025, until all of the obligations of AHA, and Lisa Albert and Penitigri Group, as Guarantors, to Auxilior under the 002 Note are paid in full.

ANSWER.  This allegation is a legal conclusion to which a response is not required.

44. Additionally, attorneys' fees have accrued, and will continue to accrue during the pendency of this action, until all of the obligations of AHA, and Lisa Albert and Penitigri Group, as Guarantors, to Auxilior under the 001 Note and the 002 Note are paid in full.

ANSWER.  This allegation is a legal conclusion to which a response is not required.

45. As noted above, under Section 10(B) of the Loan Agreement, if an Event of Default has occurred and is continuing, Auxilior has the right to appoint a receiver (a/k/a Keeper under Louisiana law) to take and maintain full control of the Collateral and any records relating thereto, and exercise each and every right granted to it under the Loan Documents and any applicable law.

ANSWER.  Defendants respond that the Loan documents speak for themselves.

19

46.   Because it is within the power of AHA to conceal, dispose of, or waste the Collateral, Auxilior, pursuant to Rule 66 of the Federal Rules of Civil Procedure, will file a separate motion seeking to appoint a Receiver (a/k/a Keeper under Louisiana law) to take and maintain full control of the Collateral and any records relating thereto.

ANSWER.  All allegations in this paragraph are denied.

## COUNTERCLAIM

1. Defendants/Counterclaim Plaintiffs AHA Huts, LLC and The Penitigri Group, LLC, (collectively, "Counterclaim Plaintiffs") incorporate by reference all preceding allegations and responses as if fully set forth herein.

2. This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367 and/or 28 U.S.C. § 1332, and venue is proper because the Forbearance Agreement(s) concern operations and collateral located in this District and are part of the same case or controversy as Auxilior's claims.

3. Plaintiff/Counter-Defendant Auxilior Capital Partners, Inc. ("Auxilior" or "Counter-Defendant") is a party to one or more written forbearance agreements with Counterclaim Plaintiffs and/or AHA Huts (collectively, the "Forbearance Agreement(s)").

20

4. In or about February 2024, AHA Huts, LLC and Auxilior Capital Partners, Inc. entered into a written Forbearance Agreement, pursuant to which Auxilior agreed to forbear from exercising certain enforcement rights under the Loan Documents subject to specified terms and conditions.  Thereafter, the parties entered into one or more additional forbearance agreements and/or amendments, including a subsequent forbearance agreement executed in or about June 2025.  *See* Forbearance Agreements attached hereto as Ex. A.

5. Each of the Forbearance Agreement(s) was intended to provide Defendants with a defined opportunity to continue operations and pursue a transaction— including an asset sale—that would satisfy or substantially reduce the alleged indebtedness owed to Auxilior.

6. The Forbearance Agreement(s) are valid and enforceable written contracts supported by consideration, pursuant to which Auxilior agreed, among other things, to forbear from exercising certain rights and remedies under the Loan Documents for a defined period and/or subject to defined conditions.

7. The Forbearance Agreement(s) contemplated that Counterclaim Plaintiffs would continue operating the restaurant business and pursue one or more transactions, including an asset sale, to enable repayment or resolution of the indebtedness.

8. Counterclaim Plaintiffs substantially performed their material obligations under the Forbearance Agreement(s), including by continuing operations, providing required information where requested, and diligently pursuing a sale transaction intended to satisfy the obligations owed to Auxilior.

9. To the extent Auxilior contends Counterclaim Plaintiffs did not perform certain obligations, any such performance was excused because Auxilior materially breached first and/or made performance impracticable by undermining the sale process and/or refusing to provide reasonable cooperation necessary for closing.

**COUNT I**

**BREACH OF CONTRACT**

10. Auxilior materially breached the Forbearance Agreement(s) by conduct including, but not limited to, the following:

a. **Interfering with the sale process** that the Forbearance Agreement(s) were intended to permit and facilitate, including conduct that chilled, delayed, or undermined negotiations and/or closing efforts with prospective purchasers;

b. **Prematurely declaring default, accelerating, or threatening enforcement** during the forbearance period and/or based on alleged defaults that were immaterial, manufactured, or otherwise inconsistent with the parties' workout framework;

22

c. **Failing and refusing to provide reasonable cooperation** necessary to consummate a transaction that would have satisfied the debt, including delays or refusals to provide payoff information, lien release mechanics, consents, or other customary closing cooperation within Auxilior's control;

d. **Communicating with third parties** (including one or more of the franchisor, landlords, or vendors) in a manner that was not authorized by the Forbearance Agreement(s) and that foreseeably disrupted operations, impaired goodwill, or undermined the contemplated sale;

e. **Acting inconsistently with the purpose of the Forbearance Agreement(s)** by taking steps designed to preserve enforcement leverage rather than permit the negotiated opportunity to close a transaction and satisfy the indebtedness.

11. Auxilior's breaches were material because they defeated the central benefit of the Forbearance Agreement(s): a meaningful opportunity for Counter-Plaintiffs to complete a transaction that would resolve or reduce the debt without destructive enforcement action.

12. As a direct and proximate result of Auxilior's breaches, Counterclaim Plaintiffs suffered damages, including but not limited to:

a. Loss of viable sale opportunities and diminution in enterprise value;

23

b. Increased operating losses and expenses incurred in reliance on forbearance terms and the anticipated sale process;

c. Increased interest, fees, costs, and charges that accrued due to delay and failed closing;

d. Reputational harm and impaired relationships with the franchisor, vendors, landlords, and prospective purchasers;

e. Attorneys' fees and costs incurred to address Auxilior's breach, to prevent improper enforcement, and to protect Counterclaim Plaintiffs' rights.

13. These damages are continuing and will be proven at trial.

WHEREFORE, Counterclaim Plaintiffs respectfully request that the Court enter judgment in their favor and against Auxilior as follows:

A. Awarding compensatory damages in an amount to be proven at trial;

B. Awarding consequential damages to the extent recoverable under applicable law;

C. Declaring that Auxilior materially breached the Forbearance Agreement(s) and is not entitled to the equitable relief it seeks based on its own breach and unclean hands;

D. Awarding Counterclaim Plaintiffs their costs and attorneys' fees to the extent permitted by contract or law; and

E. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted this 21st day of January, 2026.


/s/ Karl Bernard
Karl Bernard
Bar No. 24294
KB Law, LLC
1615 Poydras Street, Suite 900
New Orleans, LA 70112
　　　　AND
4970 Bluebonnet Blvd Suite B
Baton Rouge, LA 70809
KarlB@KarlBLaw.com


**Von A. DuBose, Esq.**
*Pro Hac Vice Forthcoming*
DUBOSE TRIAL LAW, LLC
 128 Richardson Street, SE
Atlanta, GA 30312
(404) 720-8111 – Office
von@dubosetrial.com

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of January, 2026, I caused to be served with the Clerk of Court using the CM/ECF electronic filing system, which will automatically send counsel of record e-mail notification of such filing.

| | |
|---|---|
| David M. Kerth<br>Jones Walker LLP<br>445 North Blvd., Suite 800<br>Baton Rouge, LA 70802<br>Telephone: (225) 248-2048<br>Facsimile: (225) 248-3048<br>dkerth@joneswalker.com<br><br>*Counsel for the Plaintiff*<br>Auxilior Capital Partners, Inc | Graham H. Ryan<br>Jones Walker LLP<br>201 St. Charles Avenue, Suite 5100<br>New Orleans, LA 70170-5100<br>Telephone: (504) 582-8370<br>Telefax: (504) 589-8370<br>gryan@joneswalker.com<br><br>*Counsel for the Plaintiff*<br>Auxilior Capital Partners, Inc |

Respectfully submitted this 21st day of January, 2026.

*/s/ Karl Bernard*
Karl Bernard
Bar No.
KB Law, LLC
1615 Poydras Street, Suite 900
New Orleans, LA 70112
          AND
4970 Bluebonnet Blvd Suite B
Baton Rouge, LA 70809
KarlB@KarlBLaw.com

26